**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION<br>60 Massachusetts Avenue, N.E.<br>Washington, D.C. 20002, | ) ) ) ) ) | |
|           Plaintiff, | ) ) | Civil Action No. _____ |
|    v. | ) ) | (Judge _____) |
| NORFOLK SOUTHERN RAILWAY COMPANY<br>Three Commercial Place<br>Norfolk, Virginia 23510; | ) ) ) ) ) | |
| BNSF RAILWAY<br>2650 Lou Menk Drive<br>Fort Worth, Texas 76131; | ) ) ) ) | COMPLAINT FOR<br>SPECIFIC PERFORMANCE<br><u>AND INJUNCTIVE RELIEF</u> |
| CSX CORPORATION<br>500 Water Street<br>Jacksonville, Florida 32202; | ) ) ) ) | |
| ILLINOIS CENTRAL RAILROAD COMPANY<br>935 Rue de la Gauchetiere Street West<br>Montreal, Quebec H3B 2N9; | ) ) ) ) ) | |
| CONSOLIDATED RAIL CORPORATION<br>2001 Market Street<br>Philadelphia, Pennsylvania 19103; | ) ) ) ) | |
| SOO LINE RAILROAD COMPANY<br>501 Marquette Avenue<br>Minneapolis, Minnesota 55402; | ) ) ) ) | |
| NEW ENGLAND CENTRAL RAILROAD COMPANY<br>5300 Broken Sound Boulevard, N.W.<br>Boca Raton, Florida 33487; | ) ) ) ) ) ) | |

| | |
|---|---|
| **VERMONT RAILWAY, INC.** | ) |
| **One Railway Lane** | ) |
| **Burlington, Vermont 05401;** | ) |
| | ) |
| **RAILAMERICA, INC.** | ) |
| **5300 Broken Sound Boulevard, N.W.** | ) |
| **Boca Raton, Florida 33487;** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

Plaintiff, National Railroad Passenger Corporation ("Amtrak"), by and through

undersigned counsel, for its Complaint herein states as follows:

### INTRODUCTION

1.      This action is brought to remedy the defendant freight railway companies'

conscious and concerted efforts to deprive Amtrak of the benefits of its arbitration agreements

with defendants. These efforts include (1) failing to make good faith efforts to select a member

of an arbitration panel; and (2) obstructing the selection of an arbitration panel member by the

President of the Association of American Railroads.

2.      Through their actions, the defendants have intentionally frustrated the operation

of the arbitration forum specified in the arbitration agreements and, thereby, breached their

covenants of good faith and fair dealing.

3.      Unless enjoined, defendants' actions will irreparably harm Amtrak by forcing

litigation of claims that, pursuant to its agreements with defendants, it is entitled to have resolved

through the agreed arbitration procedure.

## PARTIES

4.      Amtrak was established in 1971 by the Rail Passenger Service Act, 49 U.S.C. §

24101, *et seq.* (formerly 45 U.S.C. §§ 501-658) and is, therefore, a corporation created by Act of

Congress.

5.      The United States owns more than 50 percent of Amtrak's stock.

6.      Amtrak has its principal place of business at 60 Massachusetts Avenue, NE,

Washington, D.C. 20002.

7.      Defendant Norfolk Southern Railway is a Virginia corporation with principal

place of business at Three Commercial Place, Norfolk, Virginia 23510.

8.      Defendant BNSF Railway is a Delaware corporation with principal place of

business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.

9.      Defendant CSX Corporation is a Virginia corporation with principal place of

business at 500 Water Street, Jacksonville, Florida 32202.

10.     Defendant Illinois Central Railroad Company is an Illinois corporation with

principal place of business at 935 Rue de la Gauchetiere Street West, Montreal, Quebec H3B

2M9.

11.     Defendant Consolidated Rail Corporation ("ConRail") is a Pennsylvania

corporation with principal place of business at 2001 Market Street, Philadelphia, Pennsylvania

19103.

12.     Defendant Soo Line Railroad Company is a Minnesota corporation with principal

place of business located at 501 Marquette Avenue, Minneapolis, Minnesota 55402.

13.     Defendant New England Central Railroad, Inc. is a Vermont corporation with

principal place of business at 5300 Broken Sound Boulevard NW, Boca Raton, Florida 33487.

14.     Defendant Vermont Railway, Inc. is a Vermont corporation with principal place of business at One Railway Lane, Burlington, Vermont  05401.

15.     Defendant RailAmerica, Inc. is a Delaware corporation with principal place of business at 5300 Broken Sound Boulevard NW, Boca Raton, Florida 33487.

16.     Each of the defendants is a freight railroad, and the defendants hereinafter are collectively referred to as "the Freights".

17.     Each of the defendants and/or its parent entity is a member of the Association of American Railroads (the "AAR") headquartered in Washington, D.C.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1349 as an action by a corporation, incorporated by or under an Act of Congress, wherein the United States is the owner of more than one-half of its capital stock.

19.     In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events or omissions giving rise to the claims herein took part in the District; and (2) each of the defendants has minimum contacts with the District and is, therefore, subject to personal jurisdiction in the District.

**FACTS**

*Creation of Amtrak*

21.     In 1970, Congress enacted the Rail Passenger Service Act, 49 U.S.C. § 24101, *et seq.* (the "Act").  The Act authorized the creation of Amtrak and tasked it with providing "modern, cost-efficient, and energy-efficient intercity rail passenger transportation."  49 U.S.C. § 24101.

22.     The Act directed Amtrak to contract with other railroad companies in order for Amtrak to take on the entire responsibility for the provision of intercity rail passenger service previously provided by the other railroad companies.  49 U.S.C. § 24305.

*NRPC and Arbitration Agreements*

23.     In accordance with the directives of the Act, on or about April 16, 1971, in Washington, D.C., Amtrak entered into a set of identical agreements (the "NRPC Agreements") with each of the Freights and/or their predecessors.  These NRPC Agreements govern "the provision of services and facilities for intercity rail passenger operations. . . ."

24.     The 1971 NRPC Agreements have been reformed and amended since their original inception, but continue in force as cooperative agreements between Amtrak and the Freights.  As last amended, the NRPC Agreements are to "remain in effect at least until May 31, 2004, and thereafter until terminated by sixty (60) days' written notice to the other party."

25.     Also on or about April 16, 1971, Amtrak and the Freights, their predecessors, or parent entities entered into an arbitration agreement (the "Arbitration Agreement").

26.     Although the NRPC Agreements have been amended over the years, all iterations of the NRPC Agreements contain the following provision requiring the parties to submit disputes to binding arbitration as outlined in the Arbitration Agreement:

> [A]ny claim or controversy between Amtrak and [the Freights] concerning the interpretation, application, or implementation of this Agreement shall be submitted to binding arbitration in accordance with the provisions of the Amtrak Arbitration Agreement dated April 16, 1971, among Amtrak and certain other railroads.  The parties hereby agree to be bound by the provisions of said Arbitration Agreement.

27.     Thus, although the Arbitration Agreement itself expired April 30, 1996, the parties' obligations under the Arbitration Agreement were continued and remain in force through its incorporation in the NRPC Agreements.

***The Terms of the Arbitration Agreement***

28.     The Arbitration Agreement provides that "any claim or controversy" between Amtrak and the Freights shall be submitted to, and resolved by, a panel created by the Arbitration Agreement and known as the "National Arbitration Panel" (the "NAP").

29.     Under the Arbitration Agreement, the NAP is to consist of three members:  one selected by Amtrak, one selected by a majority of the Freights, and a chairman selected by the Amtrak and Freights representatives.

30.     The Arbitration Agreement further provides that, if a majority of the Freights are unable to agree on a representative, the President of the AAR shall choose a Freights representative to the NAP.  In addition, if the designees are unable to agree on a chairman, the Chief Justice of the United States is to appoint the chairman.

31.     The Arbitration Agreement provides that vacancies in the membership of the NAP shall be filled in the same manner as original appointments.

32.     In addition, under the Arbitration Agreement, the Freights are required to pay one-half the NAP's fees and expenses.

33.     As contemplated by the Arbitration Agreement, the NAP was formed in 1971 when Amtrak and the Freights each selected a representative, and these two designees selected a third representative to serve as national chairman.

34.     Between 1971 and the mid-1990s, the NAP operated as set forth in the Arbitration Agreement, hearing and resolving various disputes between Amtrak and the Freights.

35.     Also, between 1971 and the mid-1990s, the NAP promulgated, and periodically revised, procedural rules governing NAP proceedings.  Many of these rules have the purpose and effect of streamlining NAP proceedings, including rules setting forth time limitations, favoring written proceedings, and limiting oral testimony.

36.     From its inception through the mid-1990s, the NAP developed a body of precedent that it may apply to efficiently resolve future disputes between Amtrak and the Freights.

*NAP Operations Stalled by Freights*

37.     In or around the mid-1990s, some or all of the Freights stopped paying their portion of NAP fees and expenses.

38.     On or about July 1, 1997, due at least in part to the Freights' failure to pay their portion of NAP fees and expenses, C. George Niebank, Jr., the Freights representative to the NAP, resigned his position.

39.     Also in 1997, the NAP's National Chairman, Charles A. Horsky, died.

40.     Despite the provision of the Arbitration Agreement that NAP vacancies be filled in the same manner as original appointments, the Freights have never selected a Freights representative to replace Mr. Niebank.

41.     Moreover, by refusing to select a Freights representative to the NAP, the Freights have prevented the selection of a national chairman.

42.     In or around 1998, Amtrak, working through the AAR, urged the Freights to "re-energize" the NAP by selecting a Freights representative.

43.     In response, the Freights failed to make a good faith effort to select a Freights representative to the NAP, and obstructed such selection by the AAR.

44.     Because of the Freights' obstruction, the NAP has not been fully constituted since 1997.  Amtrak, however, has had a designated member of the NAP throughout this period.

### *CSX Action*

45.     On or about March 8, 2005, CSX Transportation, Inc., a subsidiary of Defendant CSX Corporation (collectively "CSX"), filed an action against Amtrak in the United States District Court for the Middle District of Florida, Orlando Division, Case No. 6:05cv362-ORL-31KRS ("the CSX Action").

46.     On April 18, 2005, Amtrak moved to compel arbitration and to dismiss the CSX Action based on the parties' agreement to arbitrate before the NAP.

47.     On May 18, 2005, the District Court dismissed the CSX Action without prejudice and ordered the parties to arbitrate the dispute before the NAP as required by the Arbitration Agreement.

48.     On September 12, 2005, CSX moved the Florida District Court to re-open the CSX Action, stating that arbitration of the dispute could not take place before the NAP because the Freights could not agree on the selection of a Freights representative to the NAP.

49.     In a sworn affidavit dated September 2, 2005, submitted to the District Court, John M. Gibson, Jr., Vice President-Operations Research and Planning of CSX Transportation,

Inc., stated that in a telephone call in 2004 with representatives of the Norfolk Southern Railway

Company, the Burlington Northern Santa Fe Railway, and the Union Pacific Railroad, he

expressed CSX Transportation, Inc.'s desire to appoint the Freights' representative to the NAP,

but "none of the other railroads supported appointing a railroad representative to the NAP or

reconstituting this forum."  Further, Mr. Gibson stated that:

> [T]he lack of interest or support among my counterparts at these
> three other railroads in appointing a freight railroad representative
> to the NAP is consistent with my understanding of the positions of
> the other Class 1 railroads still subject to the Arbitration
> Agreement with Amtrak.

      50.      In a sworn affidavit dated September 2, 2005, submitted to the District Court,

Gilbert Lee Feltel, Jr., Assistant Vice President-Law & Risk Management for CSX Intermodal,

Inc., and previously Senior Counsel for CSX Transportation, Inc., stated that while still with

CSX Transportation, Inc., he sought actively in 2003 and 2004 the appointment of a Freights

representative to the NAP and made substantial efforts to convince the other Freights to make

such an appointment.  His affidavit continues:

> [N]ot a single one of the other railroads still subject to the
> Arbitration Agreement with Amtrak supported appointing a
> railroad representative to the NAP or reconstituting this forum. . . .
> By the end of 2004, it was my belief that reconstituting the NAP
> under the Arbitration Agreement was a practical impossibility. . . .
> [T]he failure and refusal of a majority of the current Participating
> Railroads to appoint a railroad representative to the NAP, to
> support reconstitution of the NAP, or to authorize the President of
> the Association of American Railroads to appoint a railroad
> representative to the NAP, has created an impasse, which has
> prevented the reconstitution of the NAP.

      51.      In a sworn affidavit dated August 4, 2005 submitted to the District Court, Mark

M. Owens, Senior Director-Joint Facilities and Amtrak Operations Officer for Norfolk Southern

Railway Company, stated the following:

At the present time, several of the Freight railroads have not agreed to the appointment of a new railroad representative to the National Arbitration Panel and thus, to reconstitute the NAP, for several reasons that are not material to this matter. Several railroads also do not support the nomination of a railroad representative to the NAP by the President of the Association of American Railroads, if a majority of the Participating Railroads cannot agree on a person to appoint as railroad representative to the NAP, at least in the absence of a prior vote by the railroads upon possible, suggested railroad representatives. This impasse, which has prevented the reconstitution of the NAP, has existed for at least one year. No resolution, and no reconstitution of the NAP, appears possible, or at least likely, for at least the near future.

52.     On October 20, 2005, the District Court ordered CSX to comply with the Arbitration Agreement by requesting that, within 45 days, the President of the AAR appoint a Freights representative to the NAP.

53.     CSX, by letter dated October 25, 2005, did in fact request the President of the AAR to so select a Freights representative to the NAP within 45 days.

54.     The 45-day period provided for the President of the AAR to appoint a Freights representative expired on December 9, 2005, without any appointment being made.

55.     Amtrak is informed and believes that notwithstanding the Florida District Court's October 20, 2005 Order, the Freights agreed to obstruct the operation of the NAP by actively opposing the selection of a Freights representative by the President of the AAR.

56.     Amtrak is informed and believes that the Freights' opposition to the selection of a Freights representative caused the AAR President to refuse to select a Freights representative in the time specified by the Florida District Court's October 20, 2005 Order.

57.     By failing to make good-faith efforts to select a Freights representative to the NAP and by obstructing the selection of a Freights representative by the President of the AAR, the Freights have engaged in a conscious and calculated effort to incapacitate the NAP and

threaten thereby to deprive Amtrak of its contractual right to arbitrate its dispute with CSX, as well as future disputes between Amtrak and the Freights, before the NAP.

**COUNT I**

**Breach of Contract**
**(Failing to Select an Arbitrator)**

58.     Amtrak incorporates by reference, as if fully set forth herein, paragraphs 1 through 57 above.

59.     Amtrak and the Freights entered into binding contracts requiring the parties to arbitrate disputes before, and in accordance with the procedural rules of, the National Arbitration Panel.

60.     These agreements between Amtrak and the Freights include implied covenants of good faith and fair dealing that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contracts.

61.     The Freights have breached, and continue to breach, their covenant of good faith and fair dealing by failing to make good faith efforts to select the Freights representative to the NAP.

62.     By failing to make good faith efforts to select the Freights representative to the NAP, the Freights seek to, and in fact have, unfairly deprived Amtrak of its arbitration rights under the NPRC Agreements and the Arbitration Agreement.

WHEREFORE, Amtrak prays that the Freights be required to specifically perform under the NRPC Agreements and the Arbitration Agreements by making good faith efforts to select a Freights representative to the National Arbitration Panel.

## COUNT II

### Breach of Contract
### (Obstructing Selection of Arbitrator)

63.     Amtrak incorporates by reference, as if fully set forth herein, paragraphs 1 through 62 above.

64.     Amtrak and the Freights entered into binding contracts requiring the parties to arbitrate disputes before, and in accordance with the procedural rules of, the National Arbitration Panel.

65.     These agreements between Amtrak and the Freights include implied covenants of good faith and fair dealing that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contracts.

66.     The Freights have breached their covenant of good faith and fair dealing by opposing and obstructing the selection of a Freights representative to the NAP by the President of the AAR.

67.     By opposing and obstructing the AAR President's selection of a Freights representative, the Freights seek to, and in fact have, unfairly deprived Amtrak of its arbitration rights under the NPRC Agreements and the Arbitration Agreement.

WHEREFORE, Amtrak prays that the Freights be required to specifically perform under the NRPC Agreements and the Arbitration Agreements by, in the event that the Freights cannot agree on the selection of a Freights representative, requesting, cooperating with, and permitting the President of the AAR to select such Freights representative.

## COUNT III

### Injunctive Relief

68.     Amtrak incorporates by reference, as if fully set forth herein, paragraphs 1 through 67 above.

69.     Amtrak has a strong likelihood of success on the merits in this action, as the Freights' failure to select an arbitrator and obstruction of the AAR President's selection of an arbitrator deprive Amtrak of the right to arbitrate disputes before the NAP and, therefore, constitute breaches of the Freights' covenants of good faith and fair dealing.

70.     The Freights' breaches of their covenants of good faith and fair dealing will cause irreparable harm because Amtrak's contractual right to have the dispute between CSX and Amtrak, as well as future disputes between Amtrak and the Freights, arbitrated before the NAP will be lost; the Freights on the other hand will suffer no harm from being required to act in accordance with its agreements.

71.     The public interest is benefited when private agreements are enforced.  Moreover, the public interest, as well as judicial economy, is served by the enforcement of arbitration agreements.

72.     Thus, preliminary and permanent injunctive relief is appropriate and necessary to prevent continuing irreparable harm to Amtrak and to enforce Amtrak's legal rights under its agreements with the Freights.

### PRAYER FOR RELIEF

**WHEREFORE**, Amtrak respectfully requests that this Court:

A.     Enter an order requiring specific performance of the Arbitration Agreement by requiring the Freights to either (1) designate an arbitrator to serve as the Freights representative

to the NAP; or (2) request, encourage, and permit the President of the AAR to designate an

arbitrator to serve as the Freights representative to the NAP;

B.      Enter judgment in favor of Amtrak and against the Freights on each of the

above causes of action;

C.      Enter preliminary and permanent injunctions prohibiting the Freights from

opposing, obstructing, or failing to cooperate, directly or indirectly, in the selection by the

President of the AAR of a Freights representative to the NAP;

D.      Award Amtrak all attorneys' fees and costs of suit permitted by law; and

E.      Grant such other and further relief as the Court deems just and proper.

Dated: December  _13_, 2005                    Respectfully submitted,


By: _____/s/_____

        Richard J. Webber (DC Bar No. 193995)
        Lisa A. Estrada (DC Bar No. 467022)
        Ralph Brabham

        Arent Fox PLLC
        1050 Connecticut Avenue, NW
        Washington, DC 20036
        Tel:  202-857-6254
        Fax: 202-857-6395
        webber.richard@arentfox.com
        estrada.lisa@arentfox.com

        Counsel for Plaintiff
        National Railroad Passenger Corporation


Of Counsel
Marylin J. Milner (DC Bar No. 390626)
Associate General Counsel
National Railroad Passenger Corporation
60 Massachusetts Avenue, N.E.
Washington, DC  20002
(202) 906-3027 (Phone)
milnerm@amtrak.com


14